# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF MONTANA

In re

**HUNTER ANTON OLSON,**

Debtor.

Case No. **19-60465-BPH**

# MEMORANDUM OF DECISION

At Butte in said District this 22nd day of November, 2019.

On November 5, 2019, in this Chapter 12[1] case, a hearing on Farm Service Agency's ("FSA") motion requesting that the case be converted to Chapter 7 or dismissed ("Motion")[2] was held. FSA relies on § 1208(d) in support of its request for conversion to Chapter 7. FSA seeks dismissal on alternative grounds, alleging Debtor filed his petition in bad faith, and is not eligible for relief under Chapter 12, citing §§ 1208(c), 101(19), 109(f). Debtor responded to the Motion arguing that: (1) FSA could not prove fraud in connection with the case as required under § 1208(d); (ii) Debtor has acted in good faith, has disclosed specific information and produced documents requested; and, (iii) Debtor is a family farmer within the meaning of 11 U.S.C. § 109(f).[3]

Appearances were made on the record. FSA Exhibits 1, 2, 3, 4, 12, 13, 19, 20, 21, 24 and 25 were admitted into evidence without objection; Debtor's objections to the admission of FSA

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, all "Rule" references are to the Federal Rules of Bankruptcy Procedure, and all "Civil Rule" references are to the Federal Rules of Civil Procedure.
[2] ECF Nos. 73 and 74.
[3] ECF No. 84.

1

Exhibits 10 and 22 were overruled and Exhibits 10 and 22 were admitted; and Debtor and FSA stipulated to the admission of Exhibits A, B, C, F, G and 8, 9 and 10. Testimony was heard from Jaylein Nickels ("Nickels"), a farm loan officer with FSA; Tanner Trower ("Trower"), the general manager of Pro Co-op; Debtor; and Marilyn McMullen ("McMullen"), the Chief of FSA's farm loan programs in Montana. Following the hearing, the Court took the matter under advisement and now makes the following findings of fact and conclusions of law.

### I. BACKGROUND

#### A. Pre-Bankruptcy Events

Debtor decided to start farming in late 2017. Debtor sought an operating loan for this endeavor from FSA. FSA agreed to provide Debtor with a "beginning farmer" operating loan for his new farming venture and on November 27, 2019, Debtor executed a Promissory Note agreeing to repay the sum of $297,000, plus interest on the unpaid principal balance at the rate of 2.75% per annum.[4] The operating loan was to be paid in full on April 1, 2019.

In connection with the FSA loan, Debtor signed a Security Agreement granting FSA a security interest in "'[a]ll crops, annual and perennial grown on 1,727 acres owned by 'Smith Family Land Co III, LLC' . . . including all entitlements, benefits, and payments from all State and Federal farm programs; . . . all crop indemnity payments. . .'"[5] Debtor also granted FSA a security interest in "[a]ll farm and other equipment" including but not limited to 14 items of equipment that were specifically enumerated, which Debtor was purchasing from Nathan Smith.[6] Under the terms of the Promissory Note and Security Agreement, FSA's written approval was

---

[4] Exhibit 1.
[5] Exhibit 2.
[6] At the outset of Debtor's foray into farming, he had nothing but an FSA loan, a lease, and 14 pieces of equipment he was purchasing from Nathan Smith.

2

required prior to making any capital purchases.

In March of 2018, Debtor requested that FSA subordinate its interest in certain collateral to Western Bank of Wolf Point ("Western") in connection with a new loan he had applied for from Western. FSA consented and entered into a subordination agreement with Debtor. In connection with that subordination agreement, Debtor executed a new Security Agreement which included crops grown on an additional 1,123 acres owned by "Meier Family."[7] The farm and equipment list included with the second Security Agreement reflected that Debtor had traded a Melroe sprayer for a John Deere sprayer and had acquired a 2016 Dodge pickup, two trailers, a 1992 International truck, a 1976 Chevrolet truck and a 1988 Kenworth truck. These trade and purchases were done without FSA's approval or knowledge. FSA considered these transactions capital purchases. It had neither consented to, nor had knowledge of these transactions. Nickels advised Debtor that he could not purchase or sell FSA collateral without FSA's prior approval.

On June 11, 2018, Nickels sent Debtor a "Notification of Potential Non-Monetary Default" advising Debtor that he had failed to comply with the loan agreements. Specifically, Debtor was notified that he had continued to make capital purchases without FSA's prior consent. The notification was followed by a letter dated June 19, 2018, which set forth 23 capital purchases made by Debtor without FSA approval. FSA learned of four of those capital purchases prior to agreeing to subordinate its interest to Western in March 2018. The other purchases were discovered after the subordination agreement was executed. Debtor acknowledged receiving the foregoing notice and letter from FSA.

Debtor requested a second subordination from FSA in July 2018. FSA denied the request because of Debtor's multiple unauthorized capital purchases. However, in connection with the

---

[7] Exhibit 3.

request, FSA required that Debtor execute a third Security Agreement to include two additional leases and equipment that Debtor had acquired without FSA's approval.

In early 2019, Debtor advised FSA by text message that he had sold the remainder of his grain.[8] Although the text was sent January 9, 2019, Nickels did not respond until January 22, 2019 because FSA employees had been furloughed as a result of the United States government's shutdown. In her response, Nickels advised that Debtor could bring all his checks into the Glasgow office.[9] Debtor replied in a series of texts throughout the day:

> Perfect. I may send someone with them as I will be in Wyoming . . . . . If I sell enough to get Western Bank paid and keep the rest, would I be able to get operating for 19?

Nickels explained that FSA would likely deny any request for additional financing from Debtor. At the hearing, Nickels testified that the denial would have been the result of the unauthorized capital purchases.

Debtor did not deliver the checks to FSA. Even though the checks were not delivered to FSA for its endorsement, the back of the checks included Nickel's signature, as well as the signature of another secured creditor, Pro Co-op. Nickels testified that she did not endorse any of the checks admitted into evidence, despite the presence of her signature on the back. Nickels testified that anytime she endorsed a check on behalf of FSA, she would also include an FSA stamp. None of the checks bearing her purported endorsement contained the FSA stamp. In addition, Nickels testified that she could not have signed the checks that were deposited on January 11, 2019, and January 15, 2019, because during that period of time she was on furlough as a result of the U.S. government shutdown. Similarly, Trower testified that he did not endorse

---

[8] Exhibit 10.
[9] Taking the checks to Glasgow was necessary because the checks were made out to Debtor and FSA. FSA's endorsement was needed in order to negotiate the check.

any checks on behalf of Pro Co-op that were admitted into evidence.

On January 15, 2019, a check for $22, 884.10 issued by EGT, LLC, a grain elevator in Frazer, Montana, and payable to Debtor, FSA, Western Bank, and Pro Co-op was deposited into Debtor's Independence Bank account, number 2881. Nickels and Trower's signature appeared on the back on the back of the check.[10] Similarly, a second check issued by EGT, LLC in the amount of $20,592.23 and payable to Olson Farm and Ranch LLC[11], Hunter Olson, FSA, Western Bank, and Pro-Coop was deposited into account no. 2881 by mobile deposit on January 15, 2019.[12] The second check also had Nickels and Trower's signature on the back. These checks seemingly correspond to the sale of "Dark Northern Spring Wheat" shown in the settlement statement at Exhibit 13.

Exhibit 20 is a check issued by Columbia Grain, Inc., a grain elevator in Montana, in the amount of $27,126.28 and payable to Pro Co-op, Western Bank, FSA, and Debtor. The check was deposited by mobile deposit on January 11, 2019, into account no. 2881.[13] The check is dated January 7, 2019, and includes Nickels and Trower signature on the back. This check also appears to correspond to the sale of "Dark Northern Spring Wheat" shown in the settlement statement at Exhibit 12.

Indemnity Insurance Co. of North America issued a check in the amount of $26,156.00, payable to Debtor and FSA and Western Bank.[14] The check is dated January 16, 2019, and appears to be signed on the back by Nickels on behalf of FSA. The check was deposited by

---

[10] Exhibits 19 and 8.
[11] Olson Farm and Ranch, LLC is owned solely by Debtor. Debtor formed Olson Farm and Ranch, LLC for the purpose of operating his farming business. The LLC is listed in Debtor's bankruptcy schedules.
[12] Exhibits 21 and 8.
[13] Exhibit 8.
[14] Exhibit 12.

mobile deposit on January 24, 2019, into an account no. 2881.[15] Between January 11, 2019 and January 24, 2019, four separate checks made payable to Debtor and various third party secured creditors were deposited into account no. 2881. The total amount of the 4 checks was $96,758.61.

Debtor was questioned about the sale of grain that resulted in the settlement statements,[16] the checks in amounts that corresponded to the grain sales[17], and the deposits in the same amount into his bank account. In response to the more pointed questions, Debtor asserted his Fifth Amendment right against self-incrimination. He provided no testimony to explain or refute Nickels or Trowers testimony that their signatures were forged on the checks, or that the proceeds from the sale of grain were deposited into his bank account, rather than disbursed to the creditors that had an interest in the checks' proceeds.

### B. Post-Bankruptcy Events

Debtor filed his Chapter 12 bankruptcy petition on May 14, 2019, more than 3 months after depositing the last forged check into his account. Debtor's first set of schedules was filed on June 4, 2019. According to the schedules, Debtor had assets worth $713,265.04 and liabilities totaling $1,007,625.31. Debtor's property included crops[18] valued at $236,000. Schedule D reflects secured claims totaling $835,338.00.[19] Debtor listed FSA as having a claim of $299,000 secured by collateral having a value of $322,025. Debtor testified that he has amended his schedules several times to make them as accurate as possible. In amended schedules filed

---

[15] Exhibit 8.
[16] Exhibits 12 and 13.
[17] Exhibits 19, 20, and 21.
[18] The crops are described as, "Spring Wheat – 22,000 Bushels (Located on Smith Farms Property and Jordan Meyer Property), $110,000 Peas – 18,000 Bushels (Located on Smith Farms Property) – $126.000.00."
[19] ECF No. 17.

6

September 10, 2019, Debtor listed the value of his crops as "unknown."[20]

FSA filed Proof of Claim No. 6 on July 8, 2019, asserting a secured claim of $266,127.85 secured by crops, vehicles, machinery and equipment. Debtor has not objected to FSA's Proof of Claim. Debtor filed a Chapter 12 plan on August 12, 2019, that provided for payments over a period of five years totaling $704,494.65, of which $13,000 would be paid to FSA with interest at 6.25% per annum.[21] The deadline to object to the discharge of a debt or to Debtor's discharge expired on August 26, 2019. FSA did not object to Debtor's discharge or to the discharge of its debt. McMullen testified that FSA did not object to Debtor's discharge because Debtor had indicated that he had sufficient grain to pay the FSA debt and because FSA had a blanket lien on all Debtor's machinery and equipment.

Debtor's latest Plan filed October 28, 2019, only provides for payments totaling $161,575.63 over a period of five years. $17,000 of this amount will be paid toward FSA's secured claim and will be accompanied by the surrender of some of Debtor's farm machinery and equipment.

## ISSUES

(i) Whether this case should be converted to Chapter 7 because of fraud under § 1208(d) or because Debtor filed his petition in bad faith.

(ii) Whether this case should be dismissed under § 1208(c) and § 109(f).

---

[20] As a result of the amendment the crops are described as, "Crops located on Smith Farms – Estimated Amounts from Nathan Smith (Not a Professional Measurement Survey): 600 Bushels of Spring Wheat and 200 Bushels of treated wheat seed Mr. Smith estimated 14,000 bushels of peas and 200 bushels of left over treated pea seeds (in the bins) – the other bin contain approximately 5,000 bushels of Mr. Smith's Spring Wheat, and Crops locate don Meier's property. Estimated amounts from Don Meiers (not a professional measurement survey): approximately 4,000 bushels of wheat."
[21] ECF No. 57.

## II. APPLICABLE LAW and DISCUSSION

### A. Conversion to Chapter 7 under § 1208(d).

#### 1. Debtor has not engaged in fraud in connection with this case, making conversion to a Chapter 7 case inappropriate under § 1208(d).

Section 1208(d) allows a court, upon request by a party in interest and after notice and a hearing, to dismiss a Chapter 12 case or convert it to one under Chapter 7 "upon a showing that the debtor has committed fraud in connection with the case." The party seeking conversion of a case under § 1208(d) bears the burden of proof and must establish fraud by "clear and convincing evidence." *In re Caldwell*, 101 B.R. 728, 735 (Bankr. D. Utah 1989). As the movant, FSA must show that Debtor acted with fraudulent intent, not that he merely "took actions that happened to prejudice a creditor." *In re Nichols*, 447 B.R. 97, 108 (Bankr. N.D. NY. 2010). The remedy is "the most potent sanction a bankruptcy court may impose on a family farmer." *Nichols*, 447 B.R. at 108. It is also the only provision in the Code that authorizes involuntary conversion to chapter 7 where the debtor is a farmer. 8 COLLIER ON BANKRUPTCY ¶ 1208.04 (Richard Levin & Henry J. Sommer 16th ed. 2019).

Due to the extreme nature of § 1208(d)'s remedy, it is to be enforced against "the very few debtors who refuse to cooperate, are not forthcoming, and who evidence not only bad faith, but dishonest conduct." *Id.* (quoting *In re Bair,* 2002 Bankr. LEXIS 1895, at *17 (Bankr. D.Ka. 2002)). Courts have applied § 1208(d) and involuntarily converted cases to Chapter 7 when a debtor has acted illegally, lied, hidden or diverted assets to family members in connection with a Chapter 12 case. *Nichols*, 447 B.R. at 97 (surveying then-existing case law). Generally, § 1208(d) should be used cautiously and sparingly, and "only the most severe transgressions can support an involuntary conversion of a family farmer's case under Code § 1208(d)." *Id.*

8

In *Clark v. Devries* (*In re Clark*), the Ninth Circuit affirmed a bankruptcy judge's decision to convert a case to Chapter 7 after the debtor violated a state court order to refrain from entering or possessing his farm during the pendency of his Chapter 12 case. 652 Fed. Appx 543, 544 (9th Cir. 2016). Despite the court order, the debtor entered into a contract with a third party for the sale of 1,500 tons of alfalfa grown on the farm, received $135,000 as a down payment on the sale, and then failed to deliver the hay to the third party buyer. *Id*. The Court held that the debtor's failure to disclose the state court order to the buyer, which prohibited him from even entering the land on which the hay grew, much less harvesting it for sale, amounted to fraud that warranted conversion under § 1208(d). *Id*.

Similarly, conversion under § 1208(d) was appropriate where the debtors disclaimed a large inheritance days before filing their bankruptcy petition that effectuated a transfer of the inheritance to the debtors' children. *In re Kloubec*, 247 B.R. 246, 250 (Bankr. N.D. Iowa 2000). After filing their Chapter 12 petition, the debtors failed to disclose multiple valuable assets and granted liens and security interests to family members. *Id.* at 251–52. Taking these fraudulent acts together, the bankruptcy court found clear and convincing evidence that the debtors engaged in "a concerted pattern of conduct designed to misrepresent the financial picture of the Debtors, thereby keeping liquid assets out of the hands of unsecured creditors." *Id.* at 258. In both *Clark* and *Kloubec*, the moving party established by clear and convincing evidence fraud in the course of a bankruptcy case.

In support of conversion, FSA relies on *In re Reinbold*, 110 B.R. 442 (Bankr. D. S.D. 1990), *aff'd, Reinbold v. Dewey County Bank*, 942 F.2d 1304 (8th Cir.1991), *cert. denied*, 503 U.S. 946, 112 S.Ct. 1499, 117 L.Ed.2d 639 (1992), and *In re Williamson*, 414 B.R. 886 (Bankr. S.D. Ga. 2008). In *Reinbold*, the bankruptcy court granted a creditor's motion to convert a

9

Chapter 12 case where the debtor violated a stipulation with a secured creditor by transferring collateral to a third-party without creditor consent while the bankruptcy case was pending. *Reinbold*, 110 B.R. at 443–44. To cover up his actions, the debtor removed serial number plates on older, less valuable, machinery and surrendered the older machinery to the creditor with the intent that the creditor would think the older machinery was the creditor's collateral, when in fact it was not. *Id.* at 444, 446. *Williamson* dealt with fraud by the debtor in the form of concealment, false statements, and omissions—all of which took place during the pendency of the debtor's Chapter 12 proceeding. 414 B.R. at 888–90.

This case is distinguishable from *Reinbold* and *Williamson*. The evidence at the hearing focused almost entirely on Debtor's pre-petition conduct. FSA presented compelling evidence that Debtor engaged in forgery and conversion. However, FSA did not show that those acts were done "*in the case or in connection with this case*." In this case, Debtor's alleged fraud—forgery of checks and transfer of encumbered collateral—all occurred several months prior to Debtor's Chapter 12 filing. FSA failed to establish a nexus between these acts and this case that would permit involuntary conversion to chapter 7 under § 1208(d).

While the evidence introduced at the hearing centered on forgery and conversion, FSA also alleged in its brief that Debtor failed to account for crop sales or insurance proceeds during his bankruptcy and that Debtor made false representations during his § 341 meeting of creditors. The evidence presented at the hearing does not support these allegations. At the request of Debtor, the Court took judicial notice of his amended schedules. The crop sales and insurance proceeds were disclosed in his amended schedules.[22]

FSA's real complaint appears to be that by asserting his Fifth Amendment privilege at his

---

[22] ECF No. 42-1

10

§ 341 meeting, Debtor misrepresented his financial picture or concealed assets triggering § 1208(d)'s potent sanction. "Under the Fifth Amendment, a person has the right to remain silent without suffering any penalty for such silence, which means the imposition of any sanction that makes the assertion of the Fifth Amendment privilege 'costly.'" *In re Knedlik*, Nos. WW-08-1011-KuKJu, 07-15547, 2008 WL 8444815, *8 (9th Cir. B.A.P. June 3, 2008) quoting *Spevack v. Klein,* 385 U.S. 511, 515 87 S.Ct. 625, 17 L.Ed.2d 574 (1967). *Knedlik* seems to suggest that because bankruptcy is not a constitutional right, assertion of the Fifth Amendment may contribute to dismissal of a debtor's bankruptcy petition. *Knedlik* at *9. Despite Debtor's assertion of the privilege, FSA was able to obtain copies of checks, settlement statements and accounts statements and present a compelling case that Debtor pre-petition converted FSA's collateral, and deposited the funds in his account. In this case, this Court cannot not conclude from the record that Debtor's assertion of the Fifth Amendment privilege at his § 341 meeting was in furtherance of efforts to misrepresent his financial picture, conceal assets or part of a broader fraud in connection with the case.

**2. Debtor's case may not be converted to chapter 7 solely because his petition was allegedly filed in bad faith.**

Involuntary conversion of a chapter 12 case to chapter 7 is governed by § 1208(d) and requires more than bad faith. Strangely, despite the clear requirement under § 1208(d) that conversion requires more than bad faith FSA, citing *Reinbold* and *Williamson*, argues that:

> Mr. Olson's actions show fraud in multiple respects and are sufficient to meet § 1208(c). Indeed, his behavior parallels behavior that other courts have found sufficient under 11 U.S.C. § 1208(c) to justify conversion to Chapter 7.[23]

*Reinbold* and *Williamson* address conversion under § 1208(d), not § 1208(c). Creditors may

---

[23] ECF No. 73 at 9.

11

move to dismiss Chapter 12 cases for cause such as bad faith under § 1208(c), but § 1208(c) does not permit *conversion* for cause. *Valentine Hill Farm,* 580 B.R. at 817 ("the chapter 12 'for cause' provisions of § 1208(c) are limited to dismissal.") Unlike § 1307(c) which permits conversion or dismissal for cause, conversion of a Chapter 12 case to Chapter 7 simply is not contemplated under § 1208(c). Any request by FSA for conversion of this case based upon § 1208(c) is denied.

### B. Dismissal Under § 1208(c) and § 109(f).

#### 1. FSA requests dismissal arguing that Debtor's petition was filed in bad faith.

Under § 1208(c) a case may be dismissed for cause. "[T]he Bankruptcy Code contains an implied requirement of good faith in the filing of any bankruptcy petition." *In re Borg*, 105 B.R. 56, 57 (Bankr. D. Mont. 1989). In *Borg*, a chapter 12 case, the Court applied the "good faith" standard set forth in *In re Thirtieth Place, Inc.*, a chapter 11 case, which was stated as follows:

> Whether [good faith] exists in any case depends upon the facts and circumstances presented. No one evidentiary fact can be given paramount weight in deciding the question. If it is obvious that a debtor is attempting unreasonably to deter and harass creditors in their bona fide efforts to realize upon their securities, good faith does not exist. But if it is apparent that the purpose is not to delay or defeat creditors but rather to put an end to long delays, administration expenses ... to mortgage foreclosures, and to invoke the operation of the [bankruptcy law] in the spirit indicated by Congress in the legislation, namely, to attempt to effect a speedy efficient reorganization upon a feasible basis ... good faith cannot be denied.

30 B.R. 503, 505 (9th Cir. BAP 1983). Later, when considering dismissal of a Chapter 11 case under § 1112(b) for cause attributable to alleged bad faith, the Ninth Circuit Court of Appeals stated:

> The test is whether a debtor is attempting to unreasonably deter and harass creditors or attempting to effect a speedy, efficient reorganization on a feasible basis.

*Marsch v. Marsch* (*In re Marsch*), 36 F.3d 825, 828 (9th Cir.1994). More recently, the Ninth Circuit Bankruptcy Appellate Panel cited *Marsch* with approval, noting, "the good faith inquiry

12

focuses on the manifest purpose of the petition filing and whether the debtor is seeking to achieve thereby 'objectives outside the legitimate scope of the bankruptcy laws.'" *In re Greenberg*, 2017 WL 3816042, *4 (9th Cir. BAP 2017) (citing *Marsch*, 36 F.3d at 828).

FSA relies on the *Leavitt* factors noting that "[i]n this circuit, bankruptcy courts make good faith determinations on a case-by-case basis, after considering the totality of the circumstances." *In re Bartlett*, No. BAP CC-17-1364-LSTAL, 2018 WL 3468832, at *6 (B.A.P. 9th Cir. July 18, 2018) (citing *In re Leavitt*, 171 F.3d 1219, 1224 (9th Cir. 1999)). The *Leavitt* factors are:

> (1) whether the debtor misrepresented facts in his petition or plan, unfairly manipulated the bankruptcy code, or otherwise filed his chapter petition in an inequitable manner; (2) the debtor's history of filings and dismissals; (3) whether the debtor only intended to defeat state court litigation; and (4) whether egregious behavior is present.

*Id.* *Leavitt* was a Chapter 13 case involving alleged bad faith. This Court may consider the *Leavitt* factors, or the test outlined in *Marsch*, when evaluating the Debtor's relative bad faith when filing his chapter 12 petition. *Traders State Bank of Poplar v. Mann Farms, Inc. (In re Mann Farms, Inc.),* 917 F .2d 1210, 1214 (9th Cir.1990) (holding that cases considering the good faith requirement under both Chapters 11 and 13 are instructive and equally relevant in determining whether a petitioner initiated Chapter 12 proceedings in good faith).

Of the *Leavitt* factors, although FSA alleges Debtor misrepresented facts in his petition, the alleged misrepresentations were also the subject of later amendments. While this Court expects debtors will file their schedules accurately and completely the first time, amendments are permitted. Debtor has assisted his counsel and his counsel has diligently amended the schedules as errors were discovered. The Court declines to construe these errors as indicia of bad faith. Similarly, Debtor does not have a history of filings and dismissals. While FSA alleges the petition was filed to avoid a foreclosure by Western, the record does not show that defeating

13

state court litigation was the impetus for filing the chapter 12 petition. Even if it was, avoiding a foreclosure is not synonymous with bad faith.

Egregious behavior in connection with filing a petition manifests itself in innumerable ways. Often a petition filed in bad faith is readily apparent because the debtor fails to do much else, other than file the petition. Often, this pattern will repeat itself. *See, e.g., In re Chabot*, 411 B.R. 685, (Bankr. D. Mont. 2009) (serial filing without regard to eligibility, chapter, or a commitment to assume the burdens of the bankruptcy code in order to enjoy its benefits); *In re Weik*, 526 B.R. 829, 834 (Bankr. D. Mont. 2015) (repeated filings on the day of a scheduled auction to prevent it, and deliberate omission of creditors on schedules is conspicuously bad). Typically, in cases involving a petition filed in bad faith, a debtor enjoys the benefit of the stay immediately after filing, but does not much else to advance the case, and shirks the burdens imposed by the Code. In this case, Debtor has proceeded diligently towards confirmation.

Debtor filed his Chapter 12 Plan on August 12, 2019, within 90 days of filing his petition as required by § 1221. A hearing on objections to confirmation of the August 12, 2019 plan was held on August 27, 2019, within 45 days as required by § 1224. Debtor conceded the plan was not confirmable, requested time to file an amended plan, and moved to continue the confirmation hearing to October 8, 2019. The Court granted this request. Further, Debtor noted that fraud and good faith permeated the objections, and these allegations were at the heart of Western's pending motion to dismiss set to be heard October 8, 2019.

Following this initial confirmation hearing, FSA filed its Motion. Ultimately, Debtor and Western entered a Stipulation that resolved Western's pending motion to dismiss. This chronology is recited because it demonstrates that despite significant hurdles Debtor is working with his counsel to overcome those challenges and get to a confirmation hearing. Although the

14

provisions of §§ 1221 and 1224 contemplate confirming a Chapter 12 plan within 135 days of the petition date, this gold standard is rarely achieved in this District. More often, confirmation occurs at the second or third confirmation hearing in chapter 12 cases, 165-195 days after the petition was filed. In this case Debtor appears to be striving for a speedy, efficient reorganization.

### 2. Debtor is eligible for Chapter 12 as a Family Farmer.

FSA first argues that Debtor is not a "family farmer" as that term is defined at § 101(18) because Debtor admitted at his § 341 meeting of creditors that "he had not received more than 50 percent of his gross income from his farming operation in the two preceding tax years."[24] Pursuant to § 101(18), to be eligible for Chapter 12, Debtor's income from farming operations must exceed 50% of his gross income for "the taxable year preceding" the year in which the case was filed.

Debtor's 2018 tax return reflects that Debtor had gross income of $189,578 in 2018.[25] Of that amount, $88,425 was attributable to crop insurance proceeds, $5,670 was from agricultural program payments, and $22,844 was received from the sale of grains or other products. Debtor reported proceeds of $72,639 from non-farm related endeavors. Based upon Debtor's 2018 tax return, it appears Debtor's income from farming operations exceeded 50 percent of his gross income in 2018, the taxable year preceding the year in which he filed his Chapter 12 case. In the absence of evidence to the contrary, the Court concludes sufficient evidence exists to find that

---

[24] ECF No. 74 at 12. FSA's brief includes multiple references to § 341 testimony with citations. However, neither the transcripts of Debtor's § 341 meeting of creditors nor excerpts were offered into evidence to substantiate these allegations and FSA did not pursue this issue in any substantive way in its questioning of Debtor. Further, the § 341 meeting of creditors transcript was not used to refresh the Debtor's recollection or impeach him on this issue, or in any substantive way throughout the hearing.
[25] Exhibit P.

more than 50% of his income was derived from farming operations in 2018, as required under § 101(18).

Finally, FSA argues that Debtor does not qualify as a family farmer because his income is not sufficiently stable and regular to enable him to make payments under a Chapter 12 plan. Almost all income derived from agriculture is irregular, difficult to predict, and variable from year-to-year. Despite this, Debtor testified that he has Crop Share Agreements in place that will result in prospective income, and Debtors' tax return shows gross revenues from farming related activities in 2018 were $116,939. For purposes of eligibility, this is sufficient. However, at the confirmation hearing, Debtor will be obligated to show that his plan is feasible, as well as satisfy the other requirements of confirmation under § 1225. For the reasons discussed above, the Court will enter a separate order consistent with this Memorandum.

BY THE COURT:

Hon. Benjamin P. Hursh
United States Bankruptcy Court
District of Montana